(18)

FILED

JAN 11 2006

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

1
2
3
4
5          UNITED STATES BANKRUPTCY COURT
6          EASTERN DISTRICT OF CALIFORNIA
7                 FRESNO DIVISION
8
9
10
11                                    )
   In re                              )     Case No. 05-10024-A-13F
12                                     )
   MARTHA ESPINOZA,                    )
13                                     )
                                       )
14         Debtor.                     )
                                       )
15                                     )
   _____)
16                                     )
   MARTHA ESPINOZA,                    )     Adv. No. 05-1291
17                                     )
                                       )
18         Plaintiff,                  )
                                       )
19 vs.                                 )
                                       )
20 BOB PERALES and RICK PERALES,       )     Date: January 6, 2006
   collectively dba PAC AUTO MALL,     )     Time: 11:00 a.m.
21                                     )
                                       )
22         Defendants.                 )
                                       )
23 _____)
24              **MEMORANDUM DECISION**
25      This adversary proceeding is an action under 11 U.S.C. §
26 362(h).  It seeks damages for an alleged violation of the
27 automatic stay.  This action is within the subject matter
28 jurisdiction of the court and it is a core proceeding.  See 28

1 | U.S.C. §§ 1334(b) & 157(b)(2).

2 |     Martha Espinoza purchased a 1998 Plymouth Breeze automobile
3 | from PAC Auto Mall, Inc., ("PAC") on or about October 29, 2004.
4 | At the time of the purchase, Ms. Espinoza was a chapter 13 debtor
5 | in Case No. 04-13013.[1]  Because of that pending bankruptcy,
6 | finding a lender for the transaction was difficult.  Ultimately,
7 | on November 9, 2004, Lobel Financial agreed to lend the money for
8 | the purchase, but with full recourse against PAC.

9 |     Ms. Espinoza made the first monthly loan installment in
10 | November 2004.  However, she lost her job in November and was
11 | unable to make the December installment.

12 |     Ms. Espinoza filed a second chapter 13 petition on January
13 | 3, 2005.  She listed both PAC and Lobel Financial on Schedule D
14 | as holding claims of $429 and $4,137.70, respectively.[2]  Both
15 | claims were identified as being secured by a 1998 Plymouth Breeze
16 | with a value of $3,500.

17 | ///

[1] Case No. 04-13013 was filed on April 8, 2004 and dismissed on the chapter 13 trustee's motion on November 12, 2004.  The trustee brought the dismissal motion because, less than two months after the confirmation of a plan, the debtor's chapter 13 plan payments were in default.  The debtor's testimony that she voluntarily dismissed this earlier petition is incorrect.
Ms. Espinoza was also a debtor in an earlier chapter 13 petition, Case No. 03-15246, filed on June 4, 2003.  It was dismissed on February 26, 2004 at the request of the chapter 13 trustee because the debtor had failed to maintain plan payments.  This earlier case pre-dates the relevant events in this matter.

[2] Apparently, the $429 is the remainder of the $1,000 down payment owed by the debtor to PAC.  Lobel Financial, according to its proof of claim, financed only $3,500.94 and was owed $3,518.77 on January 3.

-2-

1    The chapter 13 plan initially proposed by the debtor

2  provided for payment in full of this claim.  That plan again

3  identified PAC and Lobel Financial as holding secured claims of

4  $429 and $4,137.70, respectively.  However, rather than list the

5  auto as having a value of $3,500, the plan valued it at $4,500.

6    On January 27, 2005, the trustee served the proposed plan

7  together with the "Notice of Chapter 13 Bankruptcy Case, Meeting

8  of Creditors, & Deadlines" ("the Notice").  By this notice,

9  creditors were advised that Ms. Espinoza had filed a chapter 13

10  petition on January 3, the meeting of creditors would be on

11  February 22, and proofs of claim had to be filed by May 23, 2005.

12    On January 29 or 31, Rick Perales, an employee at PAC and

13  brother of PAC's sole shareholder, Bob Perales, ordered and

14  obtained the repossession of the car between the hours of 8:00

15  a.m. and 10:00 a.m.  Whether the repossession occurred on January

16  29 or 31 is a matter of dispute, a dispute that the court regards

17  as irrelevant.

18    Whether the repossession was on January 29 or 31, it came

19  after the petition was filed and while the automatic stay of 11

20  U.S.C. § 362(a) was in place.  The repossession was in violation

21  of section 362(a)(3).

22    The court finds, however, that the repossession was

23  accomplished before the Notice was received and read by Mr.

24  Perales.[3]  The Notice was served on Thursday, January 27th and the

25  repossession occurred either on Saturday, January 29th, or

26  Monday, January 31st.  Given that a business is unlikely to

27

28    [3]    The reference to "Mr. Perales" is to Rick Perales.

-3-

receive mail over a weekend, given the proximity of the repossession to the mailing of the Notice, and given the early morning repossession, it is unlikely Mr. Perales received the Notice prior to the repossession.

The assertion, however, by Mr. Perales that he did not learn of the bankruptcy until the summer of 2005 is untrue. The court so finds for several reasons. First, the trustee mailed the Notice to the correct address for PAC. Second, Mr. Perales acknowledged that had the Notice been received, it would be directed to him. Third, the notice was also addressed to Lobel Financial. It obviously received it because it filed a proof of claim on February 7, 11 days after the Notice was mailed.[4] Fourth, Mr. Perales telephoned Ms. Espinoza's home immediately after the repossession and spoke to her sister, Josephine Espinoza-Villa. Ms. Villa testified that she told Mr. Perales that Ms. Espinoza had filed a chapter 13 petition during their conversation.[5]

There is another reason for the finding that Mr. Perales received notice of the bankruptcy petition shortly after the repossession of the vehicle. On January 31, Ms. Espinoza's former attorney sent a demand letter by facsimile transmission to

[4]    The court takes judicial notice of this proof of claim and the date of its filing.

[5]    While Mr. Perales denied having any such telephone conversation with Ms. Villa after the repossession, the court finds that the telephone call took place. Mr. Perales testified that had Ms. Espinoza paid for the vehicle, it would have been returned. PAC just wanted its money. It seems probable, if PAC just wanted its money, that a telephone call would be placed to inform the customer of the repossession and the conditions under which PAC would return the vehicle.

-4-

PAC demanding the return of the vehicle.  While Mr. Perales

denies receipt of the letter, the letter was transmitted to PAC's

telephone number for facsimile transmissions and the attorney's

facsimile machine produced a receipt showing that the

transmission was successful.[6]

It is unlikely that both the Notice and the facsimile

transmission were not received by PAC and Mr. Perales.  The court

finds that both were received.  Thus, Mr. Perales and PAC learned

of the filing of the petition immediately after the repossession

and probably learned of it the very day the repossession

occurred.

Over the next several months, both sides did nothing.  Mr.

Perales and PAC did nothing to restore the vehicle to Ms.

Espinoza.  And, Ms. Espinoza's former attorney did nothing to

recover possession.

Mr. Perales argues that his inaction is evidence that he was

unaware of the petition.  That argument, however, is not

plausible.  If Mr. Perales and PAC had been unaware of a

bankruptcy petition, he and PAC would have immediately

reconditioned the vehicle and sold it.  This is confirmed by the

Notice of Intention to Dispose of Motor Vehicle dated January 31,

Exhibit 8.  It indicates that PAC would sell the vehicle after

---

[6]    The receipt shows that transmission occurred at 12:03
a.m. on February 1.  Adele Eleazarian testified, however, that
the time calibration of the facsimile transmission machine was
slightly "off," and she further testified that she had an
independent recollection of sending the facsimile on January 31.
Ultimately, it makes no difference whether the transmission
occurred on January 31 or in the early morning hours of February
1.  The fact remains that it was sent, and it was received after
the repossession but before PAC resold the vehicle.

1    "February 31, 2005" [sic].  That is, a sale could occur as soon
2    as 30 days after the repossession.

3         Instead, shortly after PAC and Mr. Perales gave the Notice
4    of Intention, they learned of the petition.  They did not sell
5    the vehicle within 30 days after the repossession.  It was
6    retained until June 6, 2005.

7         It appears to the court that notice of the petition prompted
8    Mr. Perales and PAC to not sell the vehicle.  They held
9    possession and took a "wait and see" approach.  Only after five
10   months passed and when Ms. Espinoza's former attorney did nothing
11   to recover possession, Mr. Perales concluded it was safe to
12   dispose of the vehicle.

13        It was not incumbent on Ms. Espinoza or her former attorney
14   to stir Mr. Perales or PAC to action.  Having repossessed the
15   vehicle in violation of the automatic stay, Mr. Perales had an
16   obligation to restore the status quo.  See Eskanos & Adler, P.C.
17   v. Leetien, 309 F.3d 1210, 1213-15 (9th Cir. 2002).  That is,
18   upon discovering that Ms. Espinoza's petition predated the
19   repossession, he was required to put Ms. Espinoza back in
20   possession of her Plymouth.  This was not done.

21        Once a creditor becomes aware of the filing of the
22   bankruptcy petition triggering the automatic stay, any
23   intentional act that violates the automatic stay is willful.  See
24   Goichman v. Bloom (In re Bloom), 875 F.2d 224, 227 (9th Cir.
25   1989) ("'A 'willful violation' does not require a specific intent
26   to violate the automatic stay.  Rather, the statute provides for
27   damages upon a finding that the defendant knew of the automatic
28   stay and that the defendant's actions which violated the stay

-6-

were intentional.  Whether the party believes in good faith that
it had a right to the property is not relevant to whether the act
was 'willful' or whether compensation must be awarded.'  INSLAW,
Inc. v. United States (In re INSLAW, Inc.), 83 B.R. 89, 165
(Bankr. D.D.C. 1988).")  Once a creditor knows that the automatic
stay exists, the creditor bears the risk of all intentional acts
that violate the automatic stay regardless of whether the
creditor means to violate the automatic stay.  Id. at 317-18.

Therefore, the court concludes that Mr. Perales willfully
violated the automatic stay and he is liable for all actual
damages, including punitive damages, costs, and attorney's fees,
caused by his violation of the automatic stay.  See 11 U.S.C. §
362(h).

Ms. Espinoza has not claimed the value of the Plymouth
because she admits that it had no value in excess of the secured
debt.  The court therefore will award nothing for the loss of the
Plymouth.

Damages for loss of use of the Plymouth are claimed for the
period from February 1 through December 22, 2005, but there are
several problems with this claim.

First, Ms. Espinoza offered no evidence regarding the rental
value of the Plymouth.

Second, the evidence of Ms. Espinoza's out-of-pocket
expenses to obtain temporary replacement transportation is
sparse.  Her sister, Josephine Espinoza-Villa, resides with Ms.
Espinoza.  Ms. Villa testified that she permitted Ms. Espinoza to
use her car or Ms. Villa chauffeured her sister to work and on
other occasions.  Ms. Espinoza's parents did likewise.  However,

there is no evidence, or no convincing evidence, from Ms. Villa
or the parents as to the frequency that this occurred or the
additional costs they incurred when assisting Ms. Espinoza.[7]

There was mention of an agreement to pay Ms. Villa and the
parents $20 a day (when Ms. Espinoza was employed) or $10 per
trip (when she was unemployed), but there was no evidence of
other specifics such as the number of trips nor how these amounts
were calculated.  Without this evidence, the court has no factual
basis for finding that these amounts represent fair compensation
for Ms. Espinoza's use of Ms. Villa's and her parents' vehicles.

Third, in June 2005, after the Plymouth was sold and after
Ms. Espinoza's new counsel began to pursue the matter, the
defendants offered to provide Ms. Espinoza with a comparable
replacement vehicle at the same cost.[8]  This offer was declined.

Because PAC is in the business of selling used cars, and
given that Ms. Espinoza came forward with no evidence that the
offer was not a serious or a fair one, it seems likely the
defendants could have replaced the Plymouth and thereby restored
the status quo.  Their offer to do so is sufficient to cut-off

---

[7]    To the extent Josephine Espinoza-Villa expected to be
compensated for transporting her sister, the court notes that she
did not identify this expectancy as an asset in her chapter 7
petition, Case No. 05-15734, filed on July 21, 2005.

[8]    The court would not typically consider a settlement
offer relevant to the resolution of a dispute.  See Fed. R. Evid.
408.  However, in the context of a violation of the automatic
stay, the offending party is required to restore the status quo.
See Eskanos & Adler, P.C. v. Leetien, 309 F.3d 1210, 1213-15 (9th
Cir. 2002).  Here, the attempt was made, eventually.  It is
therefore appropriate to consider the offer in order to determine
what damages the plaintiff has sustained and/or how much of those
damages the defendants must pay.

-8-

their liability for loss of use damages.

Unfortunately for Ms. Espinoza, the only credible evidence of damages occasioned by the loss of use of the Plymouth pertains to the period after the defendants offered to replace it.  That proof consists of rental charges totaling $345.03 from Hertz and Enterprise.

The court awards nothing for the loss of use of the Plymouth.

Ms. Espinoza also maintains that she suffered emotional distress and upset because of the repossession of her car.  She demands damages for this injury.

In <u>In re Dawson</u>, 390 F.3d 1139 (9th Cir. 2004), the court held that damages for emotional distress are recoverable under section 362(h).  The court held:

> [W]e must determine whether Congress intended the term "actual damages" in § 362(h) to include damages for emotional distress.  We begin with the text of the statute, but it does not provide a definition for "actual damages."  There is a contextual clue, however, that lends support to Plaintiffs' theoretical position.

> Congress chose the term "individual" to describe those who are eligible to claim actual damages under § 362(h).  The statute allows any "individual," including a creditor, to recover damages.  So, for example, if a willful violation of the automatic stay damages some portion of the bankruptcy estate, both the debtor and an individual creditor of the now less-valuable estate may recover actual damages.  [Citations omitted.]  But corporations, whether debtors or creditors, are not "individuals" for the purposes of this statute.  [Citations omitted.]  By limiting the availability of actual damages under § 362(h) to individuals, Congress signaled its special interest in redressing harms that are unique to human beings.  One such harm is emotional distress, which can be suffered by individuals but not by organizations.

> . . .

> Reading the legislative history as a whole, we are

1  convinced that Congress was concerned not only with
2  financial loss, but also – at least in part – with the
   emotional and psychological toll that a violation of a
3  stay can exact from an . . . individual.  Because
   Congress meant for the automatic stay to protect more
   than financial interests, it makes sense to conclude
4  that harm done to those non-financial interests by a
   violation are cognizable as "actual damages."  We
5  conclude, then, that the "actual damages" that may be
   recovered by an individual who is injured by a willful
6  violation of the automatic stay, [footnote omitted] 11
   U.S.C. § 362(h), include damages for emotional
7  distress.

8  In re Dawson, 390 F.3d at 1146, 1148.

9      Ms. Espinoza testified: "After my car was taken away I

10 started to feel very sad because I was going through personal

11 stuff and didn't want to deal with more stuff."  She reported

12 that she asked her former attorney to recover her car quickly

13 because she was "going into a bad depression."  Ms. Espinoza also

14 maintained that the emotional distress prevented her from

15 concentrating at work.  She was moody, slept excessively, cried,

16 and entertained suicidal thoughts.  Ms. Espinoza also testified

17 that her depression caused her to seek medical help on two

18 occasions.  One doctor prescribed medication for depression and

19 anxiety.

20     In order to recover damages for emotional distress, the

21 court in Dawson explained an individual's burden of proof as

22 follows:

23      Although pecuniary loss is not required in order
        to claim emotional distress damages, not every willful
24      violation merits compensation for emotional distress. .
        .[W]e are concerned with limiting frivolous claims.  To
25      that end, we hold that, to be entitled to damages for
        emotional distress under § 362(h), an individual must
26      (1) suffer significant harm, (2) clearly establish the
        significant harm, and (3) demonstrate a causal
27      connection between that significant harm and the
        violation of the automatic stay (as distinct, for
28      instance, from the anxiety and pressures inherent in

-10-

1    the bankruptcy process).

2  <u>In re Dawson</u>, 390 F.3d at 1149.

3    If Ms. Espinoza's testimony is credible and sufficient, the

4  requirement of significant emotional harm is satisfied.  The

5  issue here is whether she has "clearly established" this

6  significant harm.  The court in <u>Dawson</u> explained how this burden

7  might be satisfied:

8        An individual may establish emotional distress damages
         clearly in several different ways.
9
         • Corroborating medical evidence may be offered.  <u>See</u>,
10       <u>e.g.</u>, <u>In re Briggs</u>, 143 B.R. 438, 463 (Bankr. E.D.
         Mich. 1992) (requiring specific and definite evidence
11       to establish an emotional distress claim arising from
         violation of the automatic stay); <u>Stinson</u>, 295 B.R.
12       [109] at 120 n. 8 [9th Cir. B.A.P. 2003] ("The majority
         of the courts have denied damages for emotional
13       distress where there is no medical or other hard
         evidence to show something more than a fleeting or
14       inconsequential injury." (internal quotation marks
         omitted)); <u>Diviney v. NationsBank of Tex. (In re</u>
15       <u>Diviney)</u>, 211 B.R. 951, 967 (Bankr. N.D. Okla. 1997)...

16       • Non-experts, such as family members, friends, or
         coworkers, may testify to manifestations of mental
17       anguish and clearly establish that significant
         emotional harm occurred.  <u>See</u>, <u>e.g.</u>, <u>Varela v. Ocasio</u>
18       <u>(In re Ocasio)</u>, 272 B.R. 815, 821–22 (1st Cir. BAP
         2002) (per curiam) (holding that testimony from the
19       debtor's wife – that he suffered from headaches, did
         not feel well for a week, and went to the doctor to
20       have his nerves checked – was sufficient to support
         emotional distress damages of $1,000 without medical
21       testimony).

22       • In some cases significant emotional distress may be
         readily apparent even without corroborative evidence.
23       For instance, the violator may have engaged in
         egregious conduct.  <u>See</u>, <u>e.g.</u>, <u>Wagner v. Ivory (In re</u>
24       <u>Wagner)</u>, 74 B.R. 898, 905 (Bankr. E.D. Pa. 1987)
         (awarding emotional distress damages, based on the
25       debtor's testimony, when a creditor entered the
         debtor's home at night, doused the lights, and
26       pretended to hold a gun to the debtor's head).  Or,
         even if the violation of the automatic stay was not
27       egregious, the circumstances may make it obvious that a
         reasonable person would suffer significant emotional
28       harm.  <u>See</u>, <u>e.g.</u>, <u>United States v. Flynn (In re Flynn)</u>,

-11-

185 B.R. 89, 93 (S.D. Ga. 1995) (affirming $5,000 award
of emotional distress damages, with no mention of
corroborating testimony, because "it is clear that
appellee suffered emotional harm" when she was forced
to cancel her son's birthday party because her checking
account had been frozen, even though the stay violation
was brief and not egregious).

The court received no corroborating testimony or other
evidence from the medical or psychological professionals treating
Ms. Espinoza or from any of Ms. Espinoza's friends or relatives.
Two relatives, a sister and a cousin who reside with Ms. Espinoza
testified but made no mention of her depression or emotional
distress.  Nor did the court receive evidence, such as copies of
medical bills, confirming the treatment received by Ms. Espinoza.

The court does not regard Mr. Perales conduct to be
"egregious."  While he repossessed the vehicle, it was done
without prior notice that a bankruptcy petition had been filed.
Although he learned of the petition immediately following the
repossession and he failed to return the vehicle, he did not
immediately dispose of the vehicle.  It appears from the evidence
that over the next five months, Ms. Espinoza'a former attorney,
other than send an initial demand letter, did nothing to press
for the return of the car.  When nothing was done for
approximately five months, the car was sold.  After Ms.
Espinoza's new counsel made it clear that Ms. Espinoza wanted the
violation of the automatic stay redressed, Mr. Perales and PAC
offered to replace the car and pay $750 in attorney's fees. His
conduct was not egregious.

Nonetheless, the court agrees that a reasonable person could
experience significant emotional harm in the face of a protracted
violation of the automatic stay, a violation that deprived that

-12-

person of mobility and made her dependent of the kindness of
others for her transportation needs.

The court will award $1,000 for emotional distress.

Ms. Espinoza also claims to have lost wages because the loss
of her car prevented her from getting to work.  The court,
however, finds and concludes that she has failed to prove any
such loss.  There is no evidence that she was unable to report to
work on particular days, no evidence of her rate of pay, and no
evidence that an absence of work was attributable to her lack of
transportation or some other reason.  Her proof suggested to the
court that she was able to go to work because of the assistance
offered by her extended family.

The court will award no damages for lost wages.

Ms. Espinoza seeks to recover the value of personal property
that was in her car when it was repossessed and that was not
returned to her.  The Notice of Seizure, Exhibit A, admits that a
blue jacket, shoes, and "misc papers" were in the car.  There is
no evidence that these items were returned to Ms. Espinoza or
otherwise disposed of by the defendants or PAC.  Mr. Perales
testified only that he was not contacted for the return of the
items.  In the circumstances presented here, it was incumbent on
him to return the items to Ms. Espinoza.  He did not, and did not
attempt to do so, and he has not accounted for these items.

According to Ms. Espinoza, the following items, with the
values indicated below, were in the car when it was repossessed:

| | |
|---|---|
| three-quarter length jacket in new condition | $150 |
| leather jacket in new condition | $150 |
| hand cream | $ 10 |
| windbreaker | $ 12 |
| Nike shoes | $100 |

-13-

| hiking boots | $250 |
| Cash belonging to cousin | $175 |
| TOTAL | $847 |

There are two problems with this demand.  Insofar as the cash is concerned, the court will not reimburse Ms. Espinoza because she admits the cash did not belong to her.  If her cousin, Victoria Valdovinos, was damaged by the violation of the automatic stay, it was incumbent on her to pursue her own claim. A recovery under section 362(h) is not limited to the debtor. However, because Ms. Valdovinos testified and never asserted that her money was in the car when it was repossessed, the court concludes that it was not in the car.

The second problem concerns the value of the clothing and shoes.  The debtor filed Schedule B, her list of personal property, on January 19, ten or twelve days prior to the repossession.  In Schedule B, she stated under penalty of perjury that all of her wearing apparel had a value of $200.  Therefore, the court concludes that all of the shoes and clothing mentioned above had a value of $200.

Aside from the cash, to the extent there is a discrepancy between what Mr. Perales and Ms. Espinoza believe was in the car, the court finds that Ms. Espinoza's list is the more accurate.

The court will award $210 for the lost personal property.

Section 362(h) specifically directs the court to grant punitive damages "in appropriate circumstances."  The appropriate circumstances entail more than a showing that there has been a willful violation of the automatic stay.  Punitive damages may not be awarded absent some showing of reckless or callous disregard for the law or rights of others.  See Protectus Alpha

-14-

1  Navigation Co. v. North Pacific Grain Growers, Inc., 767 F.2d
2  1379, 1385 (9th Cir. 1985).  Further, punitive damages cannot be
3  awarded pursuant to section 362(h) absent appreciable, actual
4  damages.  See McHenry v. Key Bank (In re McHenry), 179 B.R. 165,
5  168 (B.A.P. 9th Cir. 1995).

6       As just noted in the discussion of the emotional distress
7  damages sought by Ms. Espinoza, the court concluded that Mr.
8  Perales' conduct relative to the repossession of the vehicle was
9  not egregious.  It again so concludes in this context.

10      Finally, Ms. Espinoza is entitled to the recovery of
11  reasonable attorney's fees and costs under section 362(h).  Her
12  counsel shall file a motion for fees and costs within 10 days of
13  the filing of this Memorandum Decision.  It shall be set for
14  hearing on the notice required by Local Bankruptcy Rule 9014-
15  1(f)(1).  Counsel is cautioned that when awarding fees, it will
16  consider the result obtained.  If this caution prompts the
17  parties to resolve the issue, the court will approve a stipulated
18  amount for fees and costs.

19      The remaining issue is which of the defendants is liable for
20  the foregoing damages.

21      The evidence received by the court implicates only Mr.
22  Perales.  There is no evidence that Bob Perales, the sole
23  shareholder of PAC, was involved in this affair, either directly
24  or in a supervisory capacity.
25  ///
26  ///
27  ///
28  ///

1   Ms. Espinoza's case against Bob Perales hinges on the
2   argument that because PAC's corporate powers had been suspended,[9]
3   it is as if the PAC was a partnership.  As an owner of the
4   corporation, Bob Perales was therefore a partner and was
5   personally liable for the debts of PAC.

6   This argument has no support in California law.

7   If a California corporation fails to pay corporate franchise
8   taxes, its corporate powers are suspended.  See Cal. Rev. & Tax.
9   Code § 23301.  When a corporation's corporate powers are
10  suspended, its contracts are voidable at the option of the other
11  party to the contract, it cannot sue or defend itself in legal
12  proceedings, it is liable to the State for a $2,000 penalty, and
13  it loses the right to retain its corporate name.  See Cal. Rev. &
14  Tax. Code §§ 19135, 23302(a), 23304.1(a); Boyle v. Lakeview
15  Creamery Co., (1937) 9 Cal.2d 16, 18; Boyer v. Jones, (2001) 88
16  Cal. App.4th 220.  California does not provide, however, that the
17  shareholders, officers, or directors of a suspended corporation
18  are individually liable for the corporation's debts.

19  Therefore, judgment will be entered against Rick Perales
20  alone.  Ms. Espinoza will take nothing from Bob Perales.

21  Nor will judgment be entered against PAC for the simple
22  reason that it was not sued by Ms. Espinoza.  PAC is identified
23  only as the fictitious business name of Rick and Bob Perales.
24  Because the parties concede that PAC is a California corporation,

25  ————————————————

26      [9]   Because the evidence offered by Ms. Espinoza regarding
    PAC's corporate status and the period of any suspension, the
27  court makes no findings regarding a suspension of its corporate
    powers.  It concludes only that a suspension of those powers
28  could have no impact of the liability of Bob Perales.

-16-

it can be held liable only if it is named as a defendant.  It was not.[10]

A separate judgment will be entered after the court has determined Ms. Espinoza's reasonable attorney's fees.

Dated: 11 January 2006

By the Court

Michael S. McManus, Chief Judge
United States Bankruptcy Court

---

[10]    Assuming for sake of argument that PAC's corporate powers had been suspended, this did not relieve the plaintiff of the requirement that PAC be named as a defendant if she wanted relief against PAC.  While a suspension of corporate powers would have precluded PAC from mounting a defense, it was still entitled to be named as a defendant and served with a summons and complaint.

-17-

**CERTIFICATE OF MAILING**

I, Susan C. Cox, in the performance of my duties as a judicial assistant to the Honorable Michael S. McManus, mailed by ordinary mail to each of the parties named below a true copy of the attached document.

Office of the US Trustee
1130 O St. Room 1110
Fresno, CA 93721

Henry Nunez
4478 W Spaatz Ave
Fresno, CA 93722

Peter Bunting
2501 W Shaw Ave #119
Fresno, CA 93711

Martha Espinoza
161 Fett Ave
Parlier, CA 93648

Dated: January //, 2006

Susan C. Cox
Judicial Assistant to Judge McManus